## Imri B. Vancil v. Mary M. Hutchinson.

1. VERDICTS—*When to be Set Aside.*—A judgment upon a verdict which is clearly against the weight of the evidence will be reversed.

Assumpsit, for money had and received. Appeal from the Circuit Court of Sangamon County; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the May term, 1895. Reversed and remanded. Opinion filed December 21,1895.

CONKLING & GROUT, attorneys for appellant.

PATTON, HAMILTON & PATTON, attorneys for appellee.

MR. JUSTICE PLEASANTS DELIVERED THE OPINION OF THE COURT.

This action was commenced October 2, 1893, by appellee, upon the common counts in assumpsit, to which appellant pleaded the general issue. The trial resulted in a verdict for plaintiff for $1,997, which the court sustained against a motion for a new trial and rendered judgment thereon.

As disclosed by the evidence, plaintiff's claim was for the unpaid residue of $1,997 of the sum of $3,000, alleged to have been left for her in defendant's hands by Edmund C. Vancil, who was his father and her father-in-law. Defendant claimed that he received only $1,003, which amount, it is admitted, he paid to her; and the record presents but little else than the question of fact.

Appellee's first husband, a brother of appellant, died in 1861, leaving a daughter. After twelve or fifteen years of widowhood she married Mr. Hutchinson, her present husband, and has since resided with him in the State of Texas.

Some time in the early part of 1890, Edmund lost his wife, and about a month afterward went to live with appellant, with whom he remained until the 31st day of December, 1891, when, as the result of a fall, he died at the great age of ninety-two years, leaving several children and grand-

children, and a very considerable amount of property in money and notes. He had made a will which had been destroyed—when, how or by whom does not appear, but probably before the death of his wife. No copy of it was produced nor its contents otherwise shown. He had also given to several, if not each of his children, considerable sums of money, among them to appellee, at different times during her widowhood and afterward, the aggregate amount of which she would not attempt to state, even approximately, having kept no account of them, and which no one else appears to have known unless it was the old man himself, who deducted such advances in the cases of others in the final distribution which he made in his lifetime. Her statement, upon strong pressure from her counsel, that she did not receive $1,997 in all, after such admissions of her ignorance of the amount she and her daughter had received, must be considered of little weight since it would be true if she had received $1,796.99. It was admitted that by the will he had expressed his intention that appellee should have $3,000, but whether it was declared to be subject to such deduction was made a question pertinent to the main issue, which was, how much had he intrusted to appellant to be delivered to her.

In the latter part of April, 1890, shortly before the death of his wife, he and his sons, William A. and appellant, were together at his house, selecting from his notes the amounts he intended then to appropriate to several members of his family, respectively, and some other objects of his bounty. On that occasion William did the figuring. Appellant claims that they selected for appellee three notes, amounting to $1,003, and placed them together in an envelope, which with others so placed for other parties, the old gentleman kept for a time in his own possession to receive payments of interest thereon that should be made before delivery for their intended use. He distributed some notes to appellant and William, and perhaps to some others, within a few days —mostly notes given by them to him—for which he took their receipts; and in June following, assisted by appellant

and in the absence of William, made a further distribution and prepared receipts to be signed therefor by the distributees respectively, as before, but of which also he retained possession.

On the 11th of November, 1891, having been seriously hurt by a fall, and thinking the end was not far, he delivered to appellant for the beneficiaries the notes for the several amounts intended for them, together with the receipts therefor so prepared. We understand it was mostly, if not entirely, in notes, from the proceeds of which appellant was to pay them, though some of it may have been in notes of the parties, to be surrendered. Among them were the three above mentioned for appellee, and which appellant says were all that he ever received from his father for her.

Her claim for $1,997, to make up the $3,000 bequeathed to, and alleged to have been intrusted to him for her, and which the jury allowed, rests upon the testimony of her brother-in-law, William A. Vancil, and her nephew, A. C. Moffet, and a statement in a written communication in the name of appellant, to William, and designated in the record as "Exhibit A." Neither of these witnesses, when he testified, May, 1894, was on friendly terms with appellant. Their testimony related almost entirely to verbal admissions and statements, said to have been made by him from two to four years before, only one of which was stated to have been made in the presence of a third person, then living, and that person was not produced. Not one, therefore, was directly corroborated. Appellant positively denied them, in the sense in which they were intended for the jury. They were nearly all in the same language, viz., "that Mary (appellee) was to have $3,000," without explanation; which of itself would be no evidence that appellant ever received from his father, for her, more than $1,003, the receipt of which he admitted, and which appellee admitted he paid to her in full. He never denied, but freely admitted and may have repeatedly said, that *by the will* she was to have $3,000, but he claimed that either by it, or his father's determination after it was destroyed, or by both, that

amount was expressed to include what she had already received.     Moffet, however, also testified that about a month before the old man died, in reply to his question whether he had sent to Mary *the $2,000*, appellant said he had. And this is supposed to be made intelligible and consistent by the statement of William, on cross-examination, that at the meeting to make some division, in April, 1890, where he was told that by the will Mary was to have $3,000, and when they " were dividing up the notes," his mother and his father both "said to send Mary her money; we could keep the notes and send her the money; that there was plenty of money on hand to send her;" and that appellant then said, "by God, he would send her but a thousand;" a remarkable declaration, certainly, when we consider in whose presence and of whose money it was said to have been made.     The suggestion is that his father asked him if he had sent to appellee the two thousand, as stated by Moffet, in view of this declaration more that six months before, as stated by William, that he would send her but one thousand, showing his understanding that she was to receive $3,000, and that appellant's answer showed he had received it for her.     Appellant denied Moffet's statement, both as to the question and the answer, and that of William as well.     He testified that all he received from his father for appellee was the package of notes for $1,003.13, out of which he was to get the money; that he received them on November 11, 1891, about two weeks before the alleged conversation mentioned by Moffet, and about six before the death of his father; that he was not expected to send her the money before that event, and did not until long after.     Her receipts for the amount he sent, being $500 and $503, bear date respectively of October 10, 1892, and March 24, 1893.

On his cross-examination William A. Vancil stated that the last time he was at his father's to divide the notes was in April, and might have been the 24th, 1890, and testified, " We did not set off any notes to Mrs. Hutchinson (appellee) that day.     I did not make a memorandum in my own handwriting there of the amount to be set off to her, that I

remember of." He was then shown a memorandum as
follows—"April 24, 1890. Three (3) notes to Mrs. Mary
M. Hutchinson amount to $1,003.13," and admitted it was
all in his handwriting. We refrain from comment on the
explanation he attempted to make of it, further than to say
that in our judgment, as respects his own credit, it was
worse than a failure.

Again, he testified that two or three months after his
father's death, he wrote to appellant inquiring about the
amounts his father had appropriated to different persons
and purposes, as shown by receipts prepared for their
respective signatures, and received an answer giving the
several amounts, among which was one showing that appel-
lant had received for appellee $3,000. That is the paper
already referred to as one of the supports of appellee's
claim. It can be more intelligibly explained after the in-
troduction of some other documentary evidence and will be
noticed again in that connection. It is "Exhibit A."

He further testified that after his father's death, having
learned that appellant had not paid appellee all that was
due to her, he advised her of it, and shortly before this suit
was brought she came to visit him. He lived at Waverly, in
Sangamon county, and appellant near Modesto, in Macou-
pin. He took her to appellant's place and demanded of
him, for her, the $2,000, claimed to be still due. Appellant
denied it—said that what she had received was all that was
coming to her, and asked them both to come into the house
and look over the books and papers, but they did not go. He
says he had some business in town and was in a hurry to get
back. Appellant says that William flew into a passion and
threatened to sue him—was going to get out of the buggy
and whip him, and said he would whip him the first chance
he got; that he tried to pacify him, and did everything he
could to get him to come in and examine the books and papers
—told him they would satisfy him that he (appellant) was all
right, and that if sued he thought he could beat him without
a witness.

William and appellee were both afterward called in re-

buttal, but neither denied the fact nor the urgency of appellant's invitation or the threats he said were made and passion displayed by William.

The foregoing is substantially all of the oral testimony on behalf of appellee. As already observed, it comes from two witnesses, both being biased by personal animosity against appellant, and relates to alleged verbal statements which were separated in time and place, neither of which was directly corroborated and each of which was denied by him. That on behalf of appellant, excepting what was introduced in connection with or relation to the writings, came from himself alone, and is also in substance above set forth. We now turn to the documents.

The memorandum of William A. Vancil, offered as contradicting his oral statement and confirming that of appellant as to the setting apart for appellee of $1,003.13 at the division of April 24, 1890, has been adverted to. It was picked up by appellant's wife from the table or floor, on that day, after the business was done and the parties had separated.

Next is a receipt taken by his father from appellant, of November 11, 1891, upon delivering to him the several packages of notes the proceeds of which were by the latter to be paid over to the persons respectively named, which is as follows:

" Received of E. C. Vancil, $10,000 for Mordecai Vancil; also $3,000 for Mary M. Hutchinson, less $1,997 that she has already received on the aforesaid $3,000; also $500 for Portia Gilkerson; also $2,500 for Effie Vancil; also $2,500 for Ida Vancil; also $2,500 for Ollie Vancil; also $100 for graveyard, and $20 for " the church." All of which I agree to pay over according to instructions.

I. B. VANCIL.

EFFIE VANCIL, witness.

November, 11, 1891."

This paper, excepting the signature of appellant, is in the handwriting of his oldest daughter, Effie, now Mrs. Jordan. She testified that she wrote and witnessed it at her grandfather's request, and at his like request read and showed

it to him.   He then gave it to her father to sign, and it was put with her grandfather's papers.   It was written in his room, on the day of its date, in the presence of her father and grandfather.

An attempt was made on her cross-examination to show that it was dictated by her father.   We think nothing was elicited to impair the force of the paper or of her statements in chief respecting it.   Her answers seem to be natural and candid.   She thought she used in part a receipt which her grandfather had written, but had no very distinct recollection as to that nor as to any dictation; her father may have dictated it in part.   The material part is the deduction of previous gifts from the $3,000 for appellee.   It is not probable that appellant knew the amount of those advancements except by information from his father or the fact that notes for only $1,003 had been set apart for her.   If he mentioned the matter and amount (which does not appear) he must have done it in the presence and hearing of his father, to whom the paper was read, shown and delivered as it is, by the witness.

That he knew it and intended to have it so is further shown by the receipt prepared by him and in his own handwriting, to be signed by her when she should get the $1,003, which is as follows :

" April 30, 1890, received of E. C. Vancil one thousand and three dollars ($1,003), part of my step-father's estate, and I agree that this shall be a final receipt of all claims against my step-father up to date.   This amount is the same as specified in his will, and if I try to break his will, aid or persuade others to do so, I agree to pay back all this money and relinquish all claims to his estate."

Under this appears the following, in the handwriting of appellant's daughter, Ida : " Be sure and return this.   It is all my written authority;" which appellant explained by the statement that when he sent to her the draft for $503, in March, 1893, he directed his daughter to write the letter and inclose a receipt for the amount to be signed by appellee, and also this receipt prepared by his father for the full

amount, $1,003, not to be signed by her because she had
already receipted for the $500 sent in October, 1892, and
was to sign the inclosed for the residue, but to show her it
was all his father left him or intended for her, and to be
returned to him. He says he put it in the letter of Ida, and
mailed it himself, and that it was returned to him with the
receipt, also produced, for the $503. Appellee denied that
she received it with the draft, or ever saw it before the
trial, and her letter acknowledging the receipt of the $503
was not produced. We think the fact, however it may
have been, was immaterial. He may have inadvertently
omitted it though intending to inclose it. No motive for
withholding it is apparent. Its genuineness is fully proved
and not questioned. That he actually gave it to Ida to be so
sent, as she understood, is manifest from her request under-
written. And the appellee may have received it and for-
gotten the fact. She never had a suspicion that any more
money was left with him for her until so informed, after-
ward, by William A. Vancil, and therefore the paper was
not likely to be regarded by her as important to be remem-
bered.

It appears that some if not all the packages set apart at
the first division, April 24, 1890, were delivered to the par-
ties for whom they were intended on or before the 30th.
William A. received his at that time and the receipt pre-
pared for him to sign was dated on that day, as was appel-
lee's.

A further division was made in June, at which William
was not present. Receipts for these were prepared in like
manner, but were all retained by the old man, with the notes,
to receive and credit payments of interest thereon, until
November 11, 1891, after he was disabled, and about six
weeks before his death, when he delivered them to appel-
lant and took his receipt of that date, above set forth.

Some two or three months after his death William A.
wrote to appellant for copies of the receipts his father had
held, and received in reply the following, which is the
" Exhibit A," introduced by appellee: " I do not think it

will be necessary to copy all these receipts, as they are nearly identical in language, but will give a list of the amounts.

I. B. Vancil...................................$24,500.00
A. E. Moffett................................. 3,002.41
I. B. Vancil, for Mary....................... 3,000.00
I. B. Vancil for Mort. (Mordecai, a brother of
    appellant, in California...................... 10,000.00

The list proceeds in like manner, giving the other amounts mentioned in his receipt to E. C. Vancil of November 11, 1891, herein before copied, and others, amounting in all to a little over $100,000 and then continues : " He gave Burke $2,500 in cash, for which there is no receipt. * * * I have the notes all just as I received them, and as they have been for the last year. I have his books in which all the notes are listed. Come down some day and I will show you all about it. * * * I hope you will not be foolish enough to take this into court, as there will be nothing in it. Now I believe this is all I think of.

I. B. VANCIL."

The material item in this statement is that of " I. B. Vancil, for Mary, $3,000." It is conceded that Mary, there named, is the appellee. William testified that the body of the paper was not in the handwriting of appellant, but he believed the signature was. Appellant positively denied it, and was corroborated by his daughter Effie and his son Burke, each of whom also testified that it was in the handwriting of his daughter Ida, and not of appellant. The latter stated that when he received the request he was very busy; that his older daughter, who usually wrote for him if she was at home, was then away; that he placed all the papers in the hands of Ida, and directed her to copy the two receipts from William, and give him a list of the amounts of the others; that she had his receipt to his father of November 11, 1891, and must have taken from it the items with which her statement charges him; that after giving her all the receipts and papers, and the general direction stated, he

went about his business, and never saw or knew of her statement until it was produced on the trial; that he did not direct her to put down in that letter " I. B. Vancil, for Mary, $3,000;" and closed by saying " the amount of it is she just struck the first amount and never said anything about the conditions." Ida was too ill at the time of the trial to be present.

We perceive nothing in this explanation, of itself or in the light of any circumstances shown, which would justify a reasonable doubt of its truth.

The foregoing comprises substantially all the evidence, and is perhaps set out at unnecessary length. Had the verdict been found upon the oral testimony alone, we should have had no inclination to interfere with the finding. It would have been for the jury to reconcile, accept and reject, as they in their judgment, with their superior advantages, saw fit.

But that which seems to us to be the most convincing by far, is shown by what is more to be trusted than the recollection by witnesses of oral declarations, after the lapse of so long a time, however disinterested and honest they may be. With the correction made, as it fairly should be, of Ida's statement in the letter written in her father's name to William A. Vancil, the documentary evidence is all one way. So far as we see, it clearly preponderates against the evidence of appellant's admissions that he received $3,000 from his father for appellee, and corroborates his denials of them, and his statement of the material facts generally. The change of a disposition on his part to withhold his father's books and papers from examination by or for appellee, is refuted by the letter of Ida and the testimony of William, assented to by appellee. He had no reason to anticipate a need of these books on the trial. Whether they showed the advancements to appellee, which is all it is said they might have done, was not material to the issue; which was, how much had appellant received for her. He did not state, nor pretend to know how much she had previously received. If his father, upon his understanding or mis-

understanding, stated what it was and therefore left for her only the difference between that amount and $3,000, then whatever the books might show was the amount charged to her; it could not affect appellant's liability in this case, and that he did so state is conclusively shown by his own writing. There is nothing in the record upon which to found a charge of forgery, fraud or mistake, in connection with that statement. That he acted upon it is further shown, as we think, by the memorandum made by William on April 24, 1890. Excepting his alleged verbal admissions, there is not a particle of evidence that appellant received for appellee a dollar in cash or otherwise besides the notes for $1,003.13. He must have understood that William knew that was the amount set apart for her, and have presumed that Ida had given him the amount as stated in the receipt of November 11th; and therefore he could hardly have admitted to William or stated to his father in the presence of Moffett that he had received $2,000 more for that purpose.

It is unnecessary, and might be harmful to comment further upon the oral testimony. Being of opinion that the verdict was clearly against the weight of the evidence, the judgment will be reversed and the cause remanded.